### In re WOLF.

### Appeal of HUGGINS.
### No. 9407.

Circuit Court of Appeals, Third Circuit.
Argued Nov. 18, 1947.

Decided Jan. 21, 1948.

708

O'CONNELL, Circuit Judge, dissenting.

———◆———

William A. Consodine, Newark, N. J. (Andrew B. Crummy, of Newark, N. J., on the brief), for appellant.

William Krueger, of Newark, N. J. (Parnell & Krueger, of Newark, N. J., on the brief), for appellee.

Before MARIS, O'CONNELL and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This is an appeal by the objecting creditor from the affirmance by the District Court of the Order of the Referee in Bankruptcy granting the discharge of the bankrupt.

In 1922 the bankrupt executed notes totalling $8,000 to his uncle, Philip Remstine (whose executor is the objecting creditor). Some time in 1945 suit was started on these notes. The bankrupt moved to strike the complaint pleading the statute of limitations and lack of consideration for the execution of his notes. His motion was denied. He did not answer on the merits and on September 25, 1945, judgment was entered against him in the New Jersey Supreme Court in the amount of $14,151.95 damages and $64.10 costs. The bankrupt filed a voluntary petition in bankruptcy, in the United States District Court for the District of New Jersey on January 16, 1946, and listed in his schedule the debt to his uncle as the only liability.

The record discloses that prior both to the entry of the aforesaid judgment and the filing of the bankruptcy petition, the bankrupt on July 3, 1945, executed a deed of conveyance to his home, 74 Courter Avenue, Maplewood, New Jersey, to himself and his wife, as tenants by entireties. Title to the home had been in the bankrupt alone since 1922 and had been purchased for $12,000. At the time of the transformation to tenants by the entireties the home was mortgaged by two encumbrances. According to the testimony of the bankrupt and his wife, both mortgages were in arrears and payment was demanded by the mortgagees and it became necessary to refinance the home in order to pay off the mortgages. For this purpose, they testified, a Federal Housing Administration mortgage was secured in the amount of $7,500 which was executed by both the bankrupt and his wife; the proceeds thereof, together with additional funds alleged to have been supplied by the wife, were used to pay off the existing encumbrances and the property was put in the name of the husband and wife. At the hearing before the referee the wife testified that in September, 1944, she withdrew $300 from her own bank account (the bank book was produced) which was paid on account of one of the mortgages and at the time of the conveyance to herself and her husband

she converted some war bonds totalling about $150 and some bonus bonds totaling about $600; the proceeds of which were employed in the satisfaction of the existing mortgages. The wife testified that she had no private income and that the bank account and the monies for the war bonds were accumulated by her from gifts from her mother and monies she had saved from household allowances received from her husband. As to the bonus bonds, she testified that these had been given to her by her husband in 1934 or 1935. The bonus bonds apparently were in the name of the husband up to the time of their conversion, because the wife testified that the husband went with her to sign when they were redeemed.

Objections were filed by the judgment creditor on the ground that the bankrupt had made a transfer of his property "intending to hinder, delay and defraud his creditors". The Referee originally sustained the objections to the discharge and the District Court sent the matter back to the Referee for the purpose of taking additional testimony. At the second hearing the wife testified substantially as has been above indicated and the Referee, on January 24, 1947, entered an order vacating the denial of the discharge and made an order granting the discharge.

In the Memorandum of Referee on Re-Reference, the Referee found as a fact that: "* * * the deed conveying the property known as No. 74 Courter Avenue, Maplewood, New Jersey to the bankrupt and his wife as tenants by the entirety was executed on the insistence of the wife who had used some $750.00 of her money in making payments on mortgages covering the property. While she had received this money from her husband from time to time, she had saved it and it was her money when the payments were made * * *"

The Refree also found that the $750.00 [1] payment by the wife "represented a substantial part of the equity in the property." The Referee further found: "* * *

that it was reasonable for the bankrupt to put the property in the names of his wife and himself and that the fact that he did so is not sufficient to show an actual intent to hinder, delay and defraud his creditors * * *"

Finally, the Referee found that "the proofs do not show an actual fraudulent intent" such as to bar the bankrupt's discharge.

The District Court in disposing of a petition for review of the Referee's Order, held, after considering the record and the arguments of counsel: "It appeared that the Order of January 24, 1947, was proper in all respects" and thereupon affirmed the Order.

The simple question presented is whether the Referee's findings of fact were so "clearly erroneous" and the District Court's affirmance was such "a plain mistake which would result in the defeat of justice" as to warrant reversal by this Court.

General Order 47, 11 U.S.C.A. following section 53, provides that "the judge shall accept (the referee's) findings of fact unless clearly erroneous". Under former General Order XLVII it was provided that "the reports of referees in all * * * proceedings under the Act shall be deemed presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed."

There seems to be but little difference between the former and the present General Order. The present General Order is perhaps a shade stronger in giving effect to the Referee's findings by reason of the use of the term "clearly erroneous". The same term is used in Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c,[2] relating to findings of fact by the Court without a jury, and has been commented upon in United States

---

[1] The $750 was derived from the redemption of the $150 war bonds and the $600 First World War bonus bonds.

[2] Rule 52(a) provides in part: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the

710

v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416 at page 433 as follows: "* * * It is idle to try to define the meaning of the phrase, 'clearly erroneous'; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded. This is true to a considerable degree even when the judge has not seen the witnesses. His duty is to sift the evidence, to put it into logical sequence and to make the proper inferences from it * * *."

In the case at bar the Referee has seen and heard the witnesses and has determined their credibility and his findings have been affirmed by the District Court. We are not convinced that they are "clearly erroneous".

In Epstein v. Steinfeld, 3 Cir., 1914, 210 F. 236, at page 237 this Court said:

"The findings of the referee were made by him after he had taken a large amount of conflicting testimony covering every phase of the alleged withholding of property by the bankrupt, and when he had the opportunity to and did see the witnesses who testified. *His findings, as has been decided over and over again, ought not to be disturbed except where it is demonstrated that a plain mistake has been made.* * * *

"* * * It is the rule which has obtained in this circuit, and we again affirm it in order that it may be regarded as settled beyond controversy. The learned judge of the District Court had all the evidence and the findings of the referee before him and he has approved them. *We have thus the conclusions of two courts, and they ought not to be disturbed except for a plain mistake which would result in the defeat of justice.*" (emphasis supplied.) See also Lodi Trust Co. v. Cohn, 3 Cir., 1939, 108 F.2d 26.

In that case we held that in a review proceeding the burden is upon the objecting creditor to establish the facts necessary to prevent the bankrupt's discharge.

See also 1 Collier on Bankruptcy (14th Ed.) § 14.43.

The appellant vigorously urges that the creation in 1945 of the tenants by entireties estate under the existing circumstances makes imperative a finding of the existence of such "fraudulent intent" as to bar the bankrupt's discharge. As already stated, our review is limited to a determination whether the Referee's findings were so "clearly erroneous" and the District Court's affirmance was such a "plain mistake", as to justify a reversal. An examination of the record fails to disclose such clear error and plain mistake.

■ To bar the bankrupt's discharge there must be an actual fraudulent intent (Collier on Bankruptcy (14th Ed.) page 1360). Both the Referee and the District Court found that there was insufficient evidence to show that there was an actual intent on the part of the bankrupt to hinder, delay and defraud his creditors.

While the bankrupt's action in creating the tenancy by entireties called for an explanation, the latter was furnished in the wife's testimony concerning her contribution to the satisfaction of the prior existing mortgages out of her own funds. The Referee credited her testimony both as to the fact of the contribution and that it was out of her independent funds. Moreover, he specifically found that her contribution to the satisfaction of the old mortgages "represented a substantial part of the equity in the property"; it was reasonable for the bankrupt to create the estate by entireties and "the fact that he · did so is not sufficient to show an actual intent to hinder, delay and defraud his creditors."

■ That we might have taken a different view of the evidence and might have arrived at an opposite appraisal of it is beside the point. Epstein v. Steinfeld, supra, cited with approval in Re Gsand, 3 Cir., 1946, 153 F.2d 1001.

Other jurisdictions are in accord. In Re Gallis, 7 Cir., 1940, 115 F.2d 626 at page 627, certiorari denied sub nom. Cotsirilos v. Klein, 312 U.S. 704, 61 S.Ct. 808, 85 L.

credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. * * *"

Ed. 1137, the Court said: "The referee saw the witnesses and heard their stories at length. He was in a much better position than we, to pass on their credibility and the case is one which turns on credibility. His deliberate judgment is entitled to great weight. We must and do accept it."

█ Parenthetically it may be pointed out that prior to the creation in 1945 of the tenancy by entireties under the New Jersey law the wife had a dower interest in the property and the objecting creditor's judgment was subject to that dower interest. The bankrupt's trustee, had the new conveyance not taken place, would also have taken the property subject to the wife's dower interest.

Thus we do not have a situation here where all of the wife's present interest in the property was created solely by virtue of the new conveyance.

For the reasons stated the Order of the District Court will be affirmed.

O'CONNELL, Circuit Judge (dissenting).

While I accept the majority's statement of the question presented for our determination, to wit, whether the district court's affirmance of the referee's finding was such a plain mistake that it would result in the defeat of justice, I can come to no other conclusion than that the affirmance of the lower court has precisely that result.

I appreciate that findings of the referee are to be accorded great weight, particularly when the findings have been affirmed by the bankruptcy court. Our court nonetheless has jurisdiction, and should exercise that jurisdiction, to reverse findings which are "clearly erroneous." See In re Levy, 2 Cir., 1937, 92 F.2d 436, 437; Schapiro v. Tweedie Footwear Corp., 3 Cir., 1942, 131 F.2d 876, 878; Silver v. Rosenberg, 2 Cir., 1944, 139 F.2d 1020, 1021; and see 8 Remington on Bankruptcy, 3d Ed., § 3795, page 121. In my opinion, the findings in the instant case are "clearly erroneous."

The reading of the record leaves me free from any doubt that here we have a bald, bold, deliberate, premeditated fraud,—the transfer of property for the sole purpose of defrauding the bankrupt's creditor.

The primary issue is one of intent. This is a mixed question of fact and law. Even as a question of fact, it is reviewable on appeal since it is the ultimate fact question, thus one of law. See Schapiro v. Tweedie Footwear Corp., supra. Intent is always elusive. It cannot be hoped that a debtor, having fraudulently acted, would so admit in explicit words. Explanation by way of "window dressing" is to be expected. Intent then must be gleaned from the bankrupt's conduct, from his motives, and from his testimony. It is, therefore, the duty of the court to sift the evidence and make the proper inferences therefrom.

What was the motivating force which, after some 20 years, caused the bankrupt to act so suddenly? Was it the asserted moral obligation to his wife that he now found so convenient, or the more cogent reason that such transfer had the double-barreled effect of defrauding his creditor and at the same time retaining to himself, for all practical purposes, the same asset which he had before such transfer?

In 1922, the bankrupt purchased his home for an undisclosed amount and gave a mortgage in the amount of $10,000. There is no evidence that his wife contributed any of the purchase price. He took title in his name only. In 1927, he recast the indebtedness upon his home by a first mortgage to J. B. Jones in the amount of $8,500. No testimony is offered as to who furnished the funds that went to reduce the mortgage from $10,000 to $8,500. Both he and his wife signed the bond and mortgage. He did not at this time transfer the property to a tenancy by the entireties. Could it be for the reason that at that time there was no occasion for taking steps calculated to defraud his creditors? The amount due on the mortgage was reduced to $7,500 by two payments of $500. At neither of such times was there a transfer of the property to an estate by the entireties. In the meantime, the bankrupt became indebted to one Philip Remstine, who, in due course, demanded payment. Such payment being denied, suit was instituted in

712

the state courts for its collection. The bankrupt did not answer on the merits, and so, on September 25, 1945, judgment was entered against him in the sum of $14,216.-05. It is significant to note that title to the property, in the name of the bankrupt alone until the happening of these events, was not transferred until after he had abandoned his defense to the action in the state courts. It is also significant to note that at the time of the conveyance of the property, the bankrupt did not have any other assets with which he could have settled the claim of Remstine. Having placed his property beyond the reach of his creditor, he filed a voluntary petition in bankruptcy six months later.

After the first hearing, the referee had no difficulty, on the testimony of the bankrupt, in finding a fraud upon the creditor. I fail to discover evidence adduced at the second hearing that would support a different conclusion. The $750 payment made to reduce the mortgage indebtedness was held to have been furnished by the wife from her independent funds, and to represent a substantial part of the equity of the property. Even if it could reasonably be held that such small amount represented such equity in this property, the claim of the wife to the money as her individual property must be rejected.

This claim is bottomed on the assertion that $600 was derived from First World War bonus bonds given to her by the bankrupt: "Whenever the Government gave them out, that is when Mr. Wolf turned them over to me. When Mr. Wolf received them. 'Here,' he said, 'Here they are for all the suffering I have caused you in your life.'" The flaw in this story lies in the following provision contained in the bonds in question, prohibiting the very act asserted by the wife and upon which the referee relied for his conclusions: "This bond is not transferable, assignable, subject to attachment, levy or seizure under any legal or equitable process, and is payable * * * only to the registered owner, or in case of his death or incompetence to the representative of his estate and upon the presentation and surrender of this bond with requests for payment on the back hereof duly executed."

Likewise, the wife's claim to the War Bonds as her individual property must fall, for these bonds, in the face amount of $150, were purchased out of "money that was given to me [wife] to run the house." In Walker v. Commissioner of Internal Revenue, 3 Cir., 1947, 160 F.2d 313, this court had occasion to consider whether funds a wife had remaining in her possession after paying the household expenses out of allowances "to run the house," made to her by the husband, were her individual property. This court affirmed the Tax Court ruling that such savings remained the property of the husband. I see no reason why the same ruling should not apply in cases involving discharge from bankruptcy.

The standards to which a debtor must conform before he is entitled to the benefits of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., are aptly stated in Re Becker, D.C. N.Y. 1901, 106 F. 54, 56, affirmed per curiam 2 Cir., 1901, 112 F. 1020: "A discharge is intended to relieve misfortune, but it must be misfortune *coupled with absolute honesty*. It is the reward which the law grants to the bankrupt who brings his entire property into court and lays it, without reservation, at the feet of his creditors. This much the law demands. Where it is evident that he is scheming to be relieved of his debts while holding property which should be applied to their payment, he is not entitled to consideration from the court of bankruptcy. The discharge is denied." (Emphasis supplied.)

I would reverse.